People of the State of Illinois, Plaintiff-Appellee, v. Hubert Dale Smith, Defendant-Appellant.

Gen. No. 68–41.

Second District.

April 7, 1969.

W. H. Kasten, Gillespie, Burke & Gillespie, of Springfield, for appellant.

Philip G. Reinhard, State's Attorney of Winnebago County, of Rockford, and Daniel D. Doyle, Assistant State's Attorney, for appellee.

MR. JUSTICE ABRAHAMSON delivered the opinion of the court.

Hubert Dale Smith was found guilty of murder by a jury in the Circuit Court of Winnebago County and sentenced to imprisonment for a term of 30 to 50 years. On appeal, Smith alleges that the admission into evidence of certain written and oral statements made by him was a violation of his constitutional privilege against self-incrimination under the doctrine of Miranda v. State of Arizona, 384 US 436, 86 S Ct 1602. He also contends that certain other evidence was improperly admitted against him.

Although we are not asked to review the weight of the evidence, some summary is necessary. On August 11, 1967, Smith lived in an apartment in Rockford with

Elna Turner and her two-year-old son, Chipper Turner. At approximately 12:30 a. m. on that date Smith returned to the apartment from work. Chipper was home alone, asleep in the bedroom. Elna Turner and a girl friend arrived shortly thereafter but immediately left to purchase some cigarettes and soft drinks. Smith testified that shortly after Elna left, Chipper fell out of bed and started to cry. Smith picked Chipper up, put him back into bed, and returned to the living room to listen to records. When Chipper continued to cry, Smith returned to the room and "picked him up by . . . under his arms, and he squirmed and kicked out of my arms and landed on the floor." Again Smith replaced the child in bed and returned to the living room but when he heard Chipper breathing "real hard" he returned to the room. At this time, about 1:30 a. m., Elna and her friend returned and Chipper was rushed to the hospital where he died at 3:45 a. m. The evidence disclosed that Chipper died of severe multiple depressed skull fractures and that he had a broken leg and marked external bruising. Elna Turner testified that Chipper was in good health when she put him to bed at 11:00 p. m. on August 10.

At the pretrial hearing on the motion to suppress the confession and oral admissions, police officer John Hall testified that he went to the apartment at approximately 1:40 a. m. on August 11 pursuant to an emergency call. He and his partner rushed Elna Turner and Chipper to the hospital and Smith followed in another car with his brother. While Chipper was being treated in the emergency room, Hall went into an adjoining room to talk to Smith at approximately 2:00 a. m. Hall testified that he first took a card from his billfold and read the following to Smith:

> "1. You have the right to remain silent and not answer any questions.

"2. Anything you say can and will be used against you in a court of law.

"3. You have the right to talk to a lawyer and have him present with you while you are being questioned.

"4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions, if you wish one."

Hall further testified that he then asked Smith if he understood the rights explained to him and, with those rights in mind, did he wish to talk to him. Smith answered "yes" to both question and after "him-hawing" around, stated that he had hit the child. Hall informed the defendant that he was arrested for "child abuse," handcuffed him and took him to the patrol car. Smith's brother came up to them outside the patrol car and at Smith's direction removed some money from his pants pocket. Hall overheard Smith tell his brother to "post bond or hire a lawyer." Smith was taken to the police station, booked for child abuse and after he indicated that he did not want to use the telephone, was placed in a cell at around 2:40 a. m.

At approximately 8:30 a. m., Smith was taken to the interrogation room of the Rockford jail with Captain Pirrello and detectives Anderson and Walt Smith. Pirrello asked the defendant if his rights had been explained to him and he replied that he had been advised the night before and that he understood those rights. Smith then told Pirrello that he had been babysitting with his girl friend's child and that somehow the child fell from the bed and injured himself. When Pirrello expressed disbelief that the child's injuries could result merely from a fall, Smith said that when the baby had started to cry he became "upset and nervous" and struck the boy with his fists. Detective Walt Smith then read to the defendant the same rights enumerated by Officer

176

Hall from a card identical to that used by Hall and asked him if he would make a statement. When the defendant consented, Detective Anderson typed up the statement as dictated by the defendant that included the admission that the defendant had "become a little angry" and struck the child several times with his fist. The defendant then read the written statement, including a printed portion that again stated his rights (that he read aloud), and signed it. The trial court denied the defendant's motion and permitted the written and oral statements into evidence.

■ It is readily apparent, that the "card" used by the Rockford police includes those essential warnings required by the Miranda decision. Miranda v. Arizona, 384 US 436. The defendant contends, however, that the statements were improperly admitted since his rights, as enunciated in Miranda, were violated in three ways. First, Miranda states that if "the individual states that he wants an attorney, the interrogation must cease until an attorney is present." The defendant takes the position that the police were aware that he "wanted" an attorney when they overheard his conversation wherein he told his brother to "post bond or hire a lawyer" and that therefore, all subsequent interrogation was improper. Under the circumstances, we do not feel that this remark vitiated the defendant's waiver of his right to have counsel present. On at least three occasions, Smith was advised of his right to have an attorney present and on all three occasions he indicated that he understood that right and wished to make a statement without one. At the police station he was asked if he wanted to make a telephone call, but declined. In the case of Narro v. United States, 370 F2d 329, the accused informed her interrogator that her parents would obtain an attorney for her and then immediately made a confession. The court held that the defendant was obviously aware of her right to counsel and had voluntarily waived it. Here, Smith was re-

peatedly reminded of his right to an attorney and he at no time informed his interrogators of his wish to have one present but, on the contrary, indicated his willingness to make a statement without one.

■ Next, it is argued that the State failed to sustain its "heavy burden . . . to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination. . . ." Miranda, supra. It is argued that Smith was only 19 years of age, had only 10 years of formal education at the time of his arrest, was unfamiliar with police procedures and did not possess sufficient mental capacity to waive his constitutional rights. In support of that argument the defendant cites the case of People v. Hill, 39 Ill2d 125, 233 NE2d 367, wherein a statement of a 17-year-old accused was admitted where it appeared that there was no evidence of substandard intelligence and the defendant was "no stranger to police investigations." There is no evidence in the record before us to show that Smith was of substandard intelligence. The only evidence concerning Smith's intelligence was his testimony that he dropped out of school because of scholastic difficulties. We are not inclined to extend the Miranda doctrine to require the police to conduct an examination of the mental capacity of an accused to determine his ability to understand his rights. The Hill decision states further at page 132:

> "The factors present here, of interrogations for relatively short periods of time, unaccompanied by any semblance of coercion, have been deemed sufficient to support a finding of the voluntariness of a confession made to law enforcement authorities where the Miranda rights have been clearly explained."

■ Smith was questioned only briefly at the hospital and, the next morning, at the police station. On neither

178

occasion was there any hint of coercion nor did his statements result from prolonged and oppressive interrogation. He was able to read and answered his interrogators cogently and clearly. We feel that the State sustained its "heavy burden" and that Smith knowingly and understandingly waived his privilege.

The Miranda case also states that ". . . any evidence that the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." When the police requestioned Smith at 8:30 a. m. on August 11 they were aware that the child had died and were also aware that Smith did not know it. According to the defendant, it was incumbent on the State to apprise him of the child's death and that their failure so to do was an act of deliberate deception and that therefore his waiver was invalid. He argues that if he had known that the child had died and that he would be charged with murder rather than child abuse, he would have made no further statements.

██ ██ At the outset, we find that the "trickery" contemplated in the Miranda case and other decisions cited by the defendant, involve affirmative acts of fraud or deceit such as a misrepresentation that a friend's job would be jeopardized if the defendant did not confess (Spano v. New York, 360 US 315) or where a confession is taken while the defendant is under hypnosis (Leyra v. Denro, 347 US 556). There are no decisions to the effect that the police have a duty to disclose to an accused all material facts known to them from other sources prior to interrogation. We feel that it would be an unnecessary and dangerous extension of the Miranda doctrine to so hold in this case. The pernicious results of such a decision are obvious. In each case, the police would not only be required to admonish an accused of his basic constitutional rights against self-incrimination

but also inform him of all material facts learned by them during the course of their investigation. Clearly, the State has no right to extort confessions by deliberate fraud or trickery but, likewise, it has no obligation to apprise an accused of all factual information that it has collected against him.

■ There is no evidence of any affirmative trickery practiced by the police against Smith at his second interrogation. He did not inquire and they did not volunteer any information as to the condition of the child. His statements were virtually identical to those previously given officer Hall at the hospital. No threats or promises were made, no facts were misrepresented or any artifices employed to induce his repetition of his earlier statements. Under these circumstances, we conclude that his waiver was not invalidated by the "trickery" of his interrogators.

The defendant lastly urges that the trial court improperly denied his motion to suppress certain other evidence. On August 11 the police returned to the Smith apartment, without a search warrant, and removed certain pieces of the floor and baseboard that had bloodstains on them and a stained blanket. Approximately two weeks later they returned and removed a ring and belt that belonged to the defendant. Since the ring and belt were not offered into evidence we will not consider them further.

Elna Turner testified that she lived at the apartment with Smith, that they both worked and shared expenses, including the rent. The police informed her on August 11 that it would be necessary for them to examine the apartment and she said "okay."

The defendant maintains that Elna Turner did not consent to the search of the apartment and that, if she did consent, she had no right to waive the defendant's constitutional rights against unlawful search or seizure.

The defendant, of course, had the burden of showing that the search was unlawful (Ill Rev Stats, c 38, par 114–12(b)). Although the evidence as to the consent by Elna Turner was not overwhelming, it was not rebutted or contradicted in any way by the defense.

■ The contention that Elna Turner could not consent to a search of the apartment since she was not married to the defendant is without merit. The rule is that where two people "have equal rights to use or occupation of the premises, either may give consent to a search and the evidence thus disclosed can be used against either." The People v. Shambley, 4 Ill2d 38, 42, 122 NE2d 172; People v. Perroni, 14 Ill2d 581, 590, 153 NE2d 578. In the case of People v. Rodriquez, 79 Ill App2d 26, 35, 36, 223 NE2d 414, cited by the defendant to the contrary, the search was held unlawful not because the defendant was not married to his paramour but because it was evident that she did not jointly occupy the premises with him but only stayed with him from time to time at night.

■ Here, Elna Turner clearly had equal rights to use and occupy the apartment with Smith and her consent to its search was lawful.

We conclude that the trial court properly denied the defendant's motions to suppress both his statements and the other evidence as discussed and that the judgment should be therefore affirmed.

Judgment affirmed.

MORAN, P. J. and DAVIS, J., concur.