THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MELVIN BRADFORD, Defendant-Appellant.—(DIANA BRADFORD,
Defendant.)

First District (4th Division)    No. 79-1776

Opinion filed June 25, 1981.

JIGANTI, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Susan Ruscitti Grussel, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Melvin Bradford and his wife, Diana Bradford, were jointly charged with the murder of their 8-year-old son, Matthew. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3).) After a bench trial, they were found guilty of involuntary manslaughter. Melvin Bradford was sentenced to serve 3 to 9 years; Diana Bradford was sentenced to 2 to 6 years. Diana Bradford did not pursue the appeal. Melvin Bradford raises the following issues for review: (1) whether his confession should have been suppressed as it was obtained in violation of his fifth amendment privilege against self-incrimination; (2) whether his confession should have been suppressed as it resulted from custodial interrogation on less than probable cause in violation of his fourth amendment rights; and (3) whether the physical evidence admitted into evidence against him should have been suppressed as it resulted from a warrantless search and seizure not justified by any exception to the warrant requirement.

We affirm.

On June 4, 1977, police officers were summoned to the Bradford residence. The officers were admitted into the house and directed to a front bedroom on the second floor. There, the officers found the victim lying on a bed. The boy was wearing blue jeans which had been pulled down to his knees. His body was cold to the touch and extremely stiff.

Police Officers Koin and Martin went downstairs and questioned the mother as to why the police had been called. The mother told the officers that 30 minutes earlier she had instructed her son to take out the garbage. He did, but complained of dizziness. The mother told her son to go upstairs and to lie down. Shortly thereafter, the father informed the mother that the boy was not breathing. The mother telephoned for the fire ambulance.

On returning to the second floor front bedroom, Officer Koin observed lacerations on the top of the boy's head, bruises on the face, arms and thighs, welts on his buttocks and on the back of his legs. Ligature marks were on his ankles. In the bedroom, Officer Koin observed a chair with a belt tied around the chair arm. On the chair were stained clothes and a pillow.

Officer Martin testified that he left the front bedroom and went into the two remaining bedrooms. In the back bedroom, he saw linen, clothes, a rope and a cord lying on the bed. Though he did not touch the items, the officer saw what he thought to be blood on them. Personnel from the crime laboratory and medical examiner's office seized various items from both bedrooms of the home, among which were a length of clothesline, a knotted electrical cord, a chair pillow and another pillow, and some clothing.

Officer Koin returned to the first floor to talk with the mother. She

repeated her original account. The officer asked her to accompany him to the police station. She and her husband agreed to go to the station.

At the station, the police placed Melvin and Diana Bradford in separate interview rooms. Officer Koin questioned Mrs. Bradford; Officer Ridges questioned Mr. Bradford. Mrs. Bradford reiterated her account of what had occurred prior to calling an ambulance. Officer Koin left the room and on returning informed Mrs. Bradford that her husband had told what happened. Mrs. Bradford then stated that she would relate what happened. Officer Koin advised her of the *Miranda* rights. Mrs. Bradford waived her rights, gave a statement (People's Exhibit No. 1), but refused to sign the typed statement.

Mr. Bradford gave a similar account to Officer Ridges. He maintained that the boy had been alive at 9 p.m. despite Officer Ridges' remonstrations that the boy's body was in an advanced stage of rigor mortis. Officer Ridges left the interview room and returned with Officer Koin. Officer Ridges informed Mr. Bradford that Mrs. Bradford had told them there had been a beating. Officer Ridges then gave Mr. Bradford his *Miranda* warnings. Mr. Bradford waived his rights. He described the beating that occurred at 10:30 the morning of June 4. He saw his wife beating the boy with a piece of pool stick. He took the stick from her. Thereafter, he hit the boy with the stick and also with a knotted electrical cord. The parents suspected the boy of stealing from the mother's purse. Mr. Bradford signed a consent (People's Exhibit No. 4) permitting the police to enter the home and retrieve the pool stick.

When an assistant State's Attorney arrived at the station, he spoke separately with Mr. and Mrs. Bradford. Both were advised of their rights; both waived their rights and each gave an oral statement. When the court reporter arrived, the statements were taken and transcribed. Both read and signed their written statement (People's Exhibit No. 2 and No. 3.)

At the hearing on the motions to suppress evidence and the motion to suppress statements, defendants contradicted the police and testified that they were not advised of their rights until the assistant State's Attorney arrived. Moreover, they testified that not until the arrival of the assistant State's Attorney were they aware that they were under arrest. But, defendant's brief on appeal claims that *Miranda* warnings were given prior to his oral statement.

In denying the motions, Judge Bailey said:

"I see nothing wrong with what the police did here. * * * There is a dead body. These are the parents of the dead victim. I think the only proper thing is to probably set them down in a cool, collected place away from where the body is located, namely, to the police station, and that is exactly what they did. * * * The officers had a duty to find out what happened. The witnesses to it are these two

individuals. They sat them separately in the police station and when it appeared to the police officers that one or both of these individuals may have been involved in the death of the victim, they warned them of their constitutional rights."

I

Police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warning to be imposed simply because the questioning takes palce in the station house, or because the questioned person is one whom the police suspect. *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.

Questions which relate directly to a suspected crime after the officer's suspicion has been aroused may be permissible as on-the-scene inquiries. (*Lowe v. United States* (9th Cir. 1969), 407 F.2d 1391, 1394.) *Miranda* does not require officers to preface with a warning all noncoercive questioning conducted in the course of a routine investigation. *Lowe*, at 1395.

Police officers were called to investigate the death of 8-year-old Matthew. He was found in circumstances which would indicate that death had not occurred through natural causes. The police officers asked the parents to accompany them to the station. At this point the police were conducting an investigation. There was no need to give each parent *Miranda* warnings before questioning each of them as to the events of June 4.

■■ In questioning Mr. Bradford, Officer Ridges pointed out that his story was not consistent with the facts. Because of the advance state of rigor mortis present when the police arrived, Matthew could not have been alive at 9 p.m. as the defendant claimed. Yet, Mr. Bradford did not change his response. After Officer Ridges returned to the interview room and informed Mr. Bradford that his wife had said a beating took place, Officer Ridges read defendant his *Miranda* rights. At that point defendant had not made an inculpatory statement. We find that the *Miranda* warning was given when the interview ceased being investigatory and became custodial interrogation. *People v. Helm* (1973), 10 Ill. App. 3d 643, 295 N.E.2d 78.

This dichotomy is consistent with *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714, where the court recognized that any interview by a police officer of one suspected of a crime will have coercive aspects to it simply by virtue of the fact that the police officer is part of a law enforcement system. But, the court required something more than the fact that questioning occurred in the station house to find the coercive environment in which *Miranda* applied.

The elements of a valid arrest are present when the police inform defendant of a violation, he submits to their control, and " '[t]he evidence clearly shows * * * that the officers *intended* to effect the arrest and that the defendant so *understood* them.' " (*People v. Wipfler* (1977), 68 Ill. 2d 158, 165, 368 N.E.2d 870, 872.)

> "[T]he component of an arrest which courts have labeled the arrestee's understanding is not identical to the arrestee's subjective beliefs at the time of arrest. The accepted test of understanding is not what the arrestee thought, but 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' " (*Wipfler*, at 166.)

An assumption that one is required to cooperate with the police can hardly be equated with an arrest; every citizen has a duty to assist police officers up to the point of self-incrimination. *Wipfler*, at 167.

Defendant was again advised of his *Miranda* rights prior to his giving a written statement to the assistant State's Attorney. There is no evidence in the record that the defendant refused to give a statement. Defendant testified at the suppression hearing that he gave his statement voluntarily. There is no evidence of coercion or compulsion. The flagrancy and official misconduct found in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, are not present here. In *Brown*, police officers investigating a homicide broke into the defendant's apartment, searched it and lay in wait for him. The officers with guns drawn arrested the defendant on his return. The arrest was without probable cause. At the station the defendant was given his *Miranda* warnings and made inculpatory statements. The Supreme Court held that the *Miranda* warning did not break the causal chain between the illegal arrest and the giving of the statements.

## II

> " '[T]he test of probable cause is whether a reasonable and prudent man in possession of the knowledge which has come to the arresting officer would believe the person to be arrested is guilty of the crime; that it is something less than evidence that would result in conviction and may be founded on hearsay evidence; that it is based upon the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act.' " *People v. Denham* (1968), 41 Ill. 2d 1, 5, 241 N.E.2d 415, 418.

■■ Defendant claims that the police lacked probable cause to question him. But, the facts would indicate that the police had probable cause to initiate their investigation with the persons who resided with the victim. The victim was found in an advanced stage of rigor mortis. His body was covered with lacerations, contusions and welts. Stained clothes were

found in the victim's bedroom. There was no evidence that the victim had been attacked outside the home. Though the police could have confronted the defendant with these facts, the police chose to allow the defendant to tell his story. The police need not disclose all material facts known to them from other sources prior to interrogation. (*People v. Smith* (1969), 108 Ill. App. 2d 172, 179, 246 N.E.2d 689, 692.) We hold that the police had sufficient facts, under the circumstances, to meet the test of probable cause.

## III

A search without a warrant is reasonable and valid if it is incident to a lawful arrest and there is no requirement that the arrest be under the authority of an arrest warrant. *People v. Wright* (1968), 41 Ill. 2d 170, 173, 242 N.E.2d 180, 183.

Police officers may lawfully seize articles in plain view which, due to the surrounding circumstances, they reasonably believe constitute evidence of criminal activity. (*People v. Holt*, (1974), 18 Ill. App. 3d 10, 12, 309 N.E.2d 376, 378.) In addition, the officer must view the evidence from a position where he has the right to be. (*Holt*, at 12.) And, the facts and circumstances known to the officer at the time he acts must give rise to the reasonable belief that the item seized constitutes evidence of criminal activity. *Holt*, at 12.

There is no dispute that the officers had a right to be in the second floor front bedroom where lay the body of Matthew. The officers entered the home at the request of Mr. and Mrs. Bradford. The defendant questions the entry of the police into the rear bedroom and the seizure of a clothesline and electrical cord from the surface of the bed in that room. The State maintained that the officers could see a rope and cord lying on the bed from their vantage point on the stairs and in the hallway. But, the presence of bloodstains on the cord and rope were not evident until an officer entered the bedroom.

■■ Was it reasonable for the police officer to enter the rear bedroom in search for clues? The test of reasonableness is whether the facts available to the officer at the moment of seizure or search were such as to warrant a man of reasonable caution to believe the action taken was appropriate. (*People v. Holt* (1974), 18 Ill. App. 3d 10, 12, 309 N.E.2d 376, 378.) Here, the officer found a battered child in the front bedroom. The body indicated that the child had been administered a severe beating. But, the instruments capable of inflicting the beating were absent from the bedroom. Moreover, the presence of welts and lacerations would indicate that a rope or cord-like object had been used. With the facts known to the officers at the time of seizure, we find the officers could reasonably believe that the items seized were evidence of criminal activity.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LINN, J., concurs.

Mr. JUSTICE JIGANTI, dissenting:

I believe that the defendant's confession was involuntary because it was obtained as a direct result of police deception.

The decision in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, was intended to abolish interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational decision. In determining the voluntariness of a confession, the test is whether it was made freely and without compulsion, or whether the defendant's will was overcome at the time he confessed. (*People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931.) While police deception in eliciting a confession does not render it involuntary as a matter of law, such deception is a factor which should be considered in evaluating whether or not the confession was voluntary. *Frazier v. Cupp* (1969), 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420; *People v. Tanser* (1979), 75 Ill. App. 3d 482, 394 N.E.2d 616; *Robinson v. Smith* (W.D.N.Y. 1978), 451 F. Supp. 1278; *People v. Boerckel* (1979), 68 Ill. App. 3d 103, 385 N.E.2d 815; *cert. denied* (1980), 447 U.S. 911.

In the case at bar, the police obtained Diane Bradford's statement that she had beaten her son by misrepresenting to her that the defendant had confessed. Then, before advising the defendant of his right to remain silent, they informed him that Diane Bradford said there had been a beating. At that point, he was given the *Miranda* warnings and he confessed.

I believe that the police deception practiced here had the effect of overcoming the defendant's will and undermining his ability to freely determine the risks and benefits of cooperating with the authorities. Until he learned of Diane Bradford's statement, the defendant clung steadfastly to the exculpatory account he had given at his home. He maintained that that version was true even after Officer Ridges expressed the opinion that it was unbelievable in light of the body's advanced stage of rigor mortis. It was only after hearing of Diane Bradford's statement, which was obtained through deceit, that the defendant confessed to beating his son. According to these facts it appears as though the defendant's confession was a direct product of the police misconduct involved rather than an exercise of his own free will. The State should not be allowed to obtain confessions by the use of deliberate lies or trickery. "Such deception clearly has no place

in our system of justice." *Robinson v. Smith* (W.D.N.Y. 1978), 451 F. Supp. 1278, 1291.