THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PERRY FOX, Defendant-Appellant.

Third District   No. 82—32

Opinion filed December 30, 1982.—Rehearing denied January 26, 1983.

244

Robert Agostinelli and Thomas A. Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

Following a jury trial, the defendant, Perry Fox, was convicted of aggravated arson and sentenced to a minimum term of six years imprisonment. In this appeal the defendant contends that the trial court erred in denying his motion to suppress his confession. He also contends that even if his confession was properly admitted into evidence, he was denied a fair trial because references in the confession to the sexual gratification he received from setting fires were irrelevant and highly prejudicial.

A fire broke out on the second floor of the Continental Regency Hotel in Peoria, Illinois, during the night of April 14-15, 1981. In the course of investigating this fire, Peoria police detective Dean Dearborn and Peoria Fire Department investigator Ernest Russell spoke to the defendant, an employee of the hotel, in the main lobby around 5:30 a.m. The defendant was asked about his whereabouts at the time of the fire, his working hours and duties, the identity of his coworker, and was asked to describe any suspicious persons he might have seen in the hotel that night. At the conclusion of this conversation, which lasted about 15 minutes, Detective Dearborn and investigator Russell told the defendant that they might want to talk to him again.

Later in the day on April 15, officers from the police and fire departments were given the use of a hotel room in which to conduct interviews of hotel employees and guests. A total of six or seven guests and seven or eight employees, including the defendant and a coworker, David Banks, were interviewed.

When the interviews began, the officers had a number of suspects, including the defendant, Banks, a hotel guest and an individual who had argued with someone at the front desk on the night of the

fire.

The defendant was directed by his boss to go to Room 3702 of the hotel to be interviewed. Two fire department investigators, Captain Parker and Captain Wolgan, and two police officers, Detective Dearborn and Officer Ulrich, questioned the defendant from approximately 5:05 p.m. until 7:30 p.m. None of the officers was in uniform, although all introduced themselves to the defendant as police or fire department investigators.

During the questioning, various discrepancies between the defendant's statements and those of David Banks became apparent. For example, Banks reported that he and the defendant had smoked in the Left Bank area of the hotel on the night in question. The defendant denied smoking at all that night. The defendant also stated that he did not return to the second floor after he and Banks left the Left Bank area and went to the basement where they ate lunch and then set up a room for hotel guests. The statement was refuted by a paper sack with a sales receipt inside found in front of Room 2206. The receipt had the name "Fox" on it. Fire investigator Wolgan checked with the Avanti store and found that no one other than the defendant had ordered a sandwich for delivery to the hotel on the night of April 14. Additional discrepancies were evident when the defendant stated that he and Banks were together at all times; whereas Banks told the officers that he and the defendant were not together the entire evening.

The defendant was confronted with the discrepancies between his story and those of other employees. He was asked if he would be willing to take a polygraph examination. It was explained to him that the test was voluntary and would aid the police in their investigation by clearing up discrepancies in the statements they had taken. At the suppression hearing, the defendant admitted that he voluntarily agreed to take the polygraph examination at a private examiner's office. Both Captain Parker and Detective Dearborn testified that the defendant was not the only suspect at that time.

The three officers who were present during the questioning of the defendant in the hotel room and who testified at the suppression hearing stated that the defendant was free to leave the hotel room at any time and that no threats or promises were made to him. The defendant testified that he asked if he could go but that his questions were ignored. The defendant was offered something to eat several times throughout the evening and soda crackers, cheese and peanut butter were brought to the hotel room. The defendant declined food but drank a soda.

During the 45 minutes wait before the polygraph examination could be arranged the television set was turned on and the defendant watched television. The defendant never asked that the interview be discontinued, nor did he claim that he was ill.

Captain Parker offered to drive the defendant to the polygraph examiner's office. The defendant accepted the offer and at approximately 9 p.m., he arrived with officers Parker and Dearborn at the firm of Dennis Jenkins and Associates. Michael Terrell, an employee of the firm who administered the polygraph test to the defendant, was briefed by Captain Parker concerning the fire and the discrepancies between the defendant's statements and those of others.

Terrell administered the series of three minute tests to the defendant after first reading him *Miranda*-type warnings which are customarily given to all persons before a polygraph examination. The defendant read the rights form and signed it.

About 1½ to 2 hours after beginning the examination, Terrell exited his office and informed Detective Dearborn that the defendant had made an oral admission and wanted to speak to him. Dearborn and Parker had remained in an adjoining room during the examination.

Dearborn and Terrell entered Terrell's office, at which time Dearborn informed the defendant that he was no longer free to go and that he was under arrest for arson. The defendant was informed of his *Miranda* rights. He replied that he understood them and that he wished to speak to Dearborn without an attorney being present. Terrell left the office and the defendant then made an oral statement to Dearborn.

Terrell then returned to his office, and he and Dearborn elicited more details from the defendant concerning how the fire was started. Dearborn asked the defendant if he was willing to give a written statement. When the defendant agreed to do so, he was taken to the police station by officers Dearborn and Ulrich around 12:30 a.m. After once again being informed of his *Miranda* rights and waiving them, the defendant gave a written statement.

The 19-year-old defendant, a high school graduate with no prior criminal record, contends on appeal that his fourth amendment rights were violated when he was improperly subjected to custodial interrogation in the hotel room, since he had not been advised of his *Miranda* rights. He further contends that his inculpatory statement to the polygraph examiner was tainted as the fruit of this illegal seizure. Thus, he claims the trial court erred in denying his motion to suppress that statement. We agree with the defendant's contentions.

The trial court found that the defendant was significantly restrained in the hotel room due to his youthful age, his inexperience in criminal matters, the presence of four investigators and the fact that he had been directed to go to the hotel room by his boss. However, the court also found that the defendant was not in custody or under arrest while in the hotel room, since he would have been allowed to leave had he expressed a desire to do so. In addition, the court held that after volunteering to take the polygraph examination, the defendant was not restrained during the 45-minute wait while the examination was being scheduled. Lastly, the trial court determined that the defendant voluntarily made his statement to the polygraph examiner after a knowing and intelligent waiver of his *Miranda* rights.

We now examine these findings and our view of the record before us in light of relevant case law. The detention of a person by the police for custodial interrogation intrudes so severely on interests protected by the fourth amendment that it necessarily triggers the traditional safeguards against illegal arrest. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) Where a defendant is detained without probable cause, the fruits of the illegal detention must be suppressed, including any inculpatory statements made by the defendant as a result of the detention. *Dunaway v. New York.*

■■ We agree with the trial court's finding that the defendant was "significantly restrained" during the interrogation in the hotel room. Unlike the trial court, we conclude that this restraint or detention continued during the 45-minute wait while the polygraph examination was being scheduled. The critical inquiry thus becomes whether this detention was illegal. If so, the defendant's fourth amendment rights were violated, and the defendant's inculpatory statements to the authorities must be suppressed as the fruits of this illegal detention.

■■ We hold that the defendant was illegally seized and detained for custodial interrogation when he was questioned by the four investigators. More than a limited intrusion upon the 19-year-old defendant's liberty was involved where he was told to report to the room for questioning by his boss, an authority figure, and where the defendant had no prior criminal record. A significant deprivation of the defendant's freedom occurred when the investigating officers focused their inquiry upon the defendant as opposed to other suspects and repeatedly confronted the defendant with discrepancies in his statements. (*People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.) Although the investigators testified that the defendant was free to leave the hotel room as opposed, for example, to the defendant in *Dunaway* who would have been physically restrained if he had tried to escape, it is

difficult to imagine that the defendant, a stranger to criminal investigatory techniques, would have felt free to leave. The uncommunicated ideas or intentions of the investigators cannot be ascribed to the defendant. *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295.

Because the officers clearly lacked probable cause to arrest the defendant when they questioned him in the hotel room, we hold that the defendant was illegally seized within the meaning of the fourth amendment.

■ How long did this illegal detention last? The questioning in the hotel room lasted from approximately 5 p.m. until 7:45 p.m. We have previously indicated that we disagree with the trial court's determination that the restraint upon the defendant ended after he agreed to take a polygraph examination. During the 45-minute wait before arrangements for the examination could be made the defendant remained in the hotel room with at least two of the investigating officers. Thus the illegal detention continued during this period. We hold that it persisted throughout the evening, including the time spent traveling to the polygraph examiner's office in a police car (see *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, and *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781) and the period of time devoted to the polygraph examination. The polygraph examiner, Terrell, acted as an agent for the police in questioning the defendant and administering the polygraph tests. As Terrell admitted on the witness stand, he employed psychological tactics and ploys in an attempt to solicit more information from the defendant. Because the defendant made an inculpatory statement to Terrell which was followed shortly thereafter by the defendant's arrest and his oral confession to Detective Dearborn, we conclude that the defendant's illegal detention continued throughout the evening, including the period of time during which he made his incriminating statements.

■ Remaining for our consideration is the question of whether the unconstitutional police conduct so tainted the defendant's inculpatory statements as to render them inadmissible at the defendant's trial. The fact that *Miranda* warnings were given, first by Terrell, then by Detective Dearborn before the defendant's oral confession, and again by another officer at the police station before the defendant gave a written statement, is not sufficient, alone, to attenuate the taint of the police misconduct. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) In *Brown v. Illinois*,

the Supreme Court recognized three additional factors which must be considered in determining whether confessions were obtained as a result of the prior illegal seizure of the defendant by the police: (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.

■■ The burden of showing admissibility rests on the prosecution. This burden was not met in the present case. Having recognized that *Miranda* warnings were given but fully cognizant of the fact that the giving of these warnings alone is insufficient to dissipate the taint of the defendant's illegal seizure upon his subsequent confession, we turn to the remaining factors discussed in *Brown v. Illinois.*

Temporal proximity is present here. Once the defendant came to be in custody in the hotel room, shortly after 5 p.m., he was in the company of the investigating officers or their agent until he made his inculpatory statement. Lengthy questioning took place, with only a brief respite in the hotel room while the arrangements for the polygraph examination were made and for a second short interval while the defendant was driven to the examiner's office. These interruptions did not cause a break in the temporal proximity of the defendant's illegal detention and his confession.

The third *Brown v. Illinois* factor, that of presence of intervening circumstances, is missing in the present case. Certainly the 45-minute break in the hotel room and the short ride to the examiner's office do not qualify as intervening factors of any significance. (*People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046; *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781.) Nor do we believe the polygraph examination itself can be said to be a significant intervening factor, since we conclude that the defendant's consent to the examination was itself tainted by his illegal seizure.

The final factor is the flagrancy or purposefulness of the police misconduct. We agree with the trial court that the police actions cannot be characterized as flagrant. However, they were purposeful in that they appear to have been an "expedition for evidence." *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262; *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103.

For the foregoing reasons, we hold that the defendant's inculpatory statements to the police were the fruit of his prior illegal seizure. Thus, the trial court erred in denying the defendant's motion to suppress those statements.

Our holding today eliminates any need to discuss the remaining is-

sue raised by the defendant. Accordingly, the judgment of the circuit court of Peoria County is reversed.

Reversed.

STOUDER, J., concurs.

PRESIDING JUSTICE BARRY, dissenting:

I disagree with the decision of the majority. As I view the facts and the applicable law, the trial court did not err in ruling that defendant's constitutional rights were not violated, and the trial court did not err in admitting defendant's confession into evidence.

The determinative issue is whether defendant was illegally detained for custodial interrogation at the hotel before he was advised of his constitutional rights and before the police had probable cause to arrest him. The United States Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) The application of this definition in particular fact situations has provided must grist for the judicial mill. In *People v. Savory* (1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226, the court comprehensively summarized post-*Miranda* decisions and detailed the criteria to be used by reviewing courts as follows:

> "In determining whether a statement was made in a custodial setting, the court must look to all of the circumstances surrounding the questioning, with no single factor deemed controlling, and then objectively evaluate whether a reasonable, innocent person would have believed he was free to leave or was expressly or impliedly bound to remain in the presence of police. [Citations.]
>
> Numerous factors are to be considered in this inquiry: the location [citation], time [citation], length [citation], mood and mode [citation] of the interrogation; the number of police officers present [citations] and the presence or absence of friends or family of the accused [citation]; any indicia of formal arrest of the subject including physical restraint, show of weapons or force, booking, fingerprinting or informing the person he is under arrest [citation]; the manner in which the person questioned got to the place of interrogation, *i.e.*, voluntarily on his own, in response to a police request, or on a verbal command indicating

compulsion [citation]; whether he voluntarily assists police in their investigation [citation]; whether the subject is allowed to walk within and from the location of the interrogation unaccompanied by police [citation]; and the age, intelligence and mental makeup of the accused [citation]." 105 Ill. App. 3d 1023, 1028, 435 N.E.2d 226, 230.

Turning to the case at bar, I think it most significant that the interrogation of the defendant took place in a room at the hotel where defendant was employed and where the crime had occurred. Defendant was initially questioned at the scene of the fire at 5:30 a.m. and then allowed to go home. He returned to work in the late afternoon and was told by his employer, not by the police, to go to Room 3702 to be interviewed. I believe it significant to note that every single case relied upon by the majority involved an interrogation that took place at a police station. It is surely much more likely that a defendant is in police custody when the police put him in a car and transport him to the police station for an interview.

Although the majority expressly hold that this defendant was "illegally seized," apparently at the point when the officers "focused their inquiry upon the defendant," I believe such a holding is unsupportable under the circumstances of this case. Here defendant was interviewed in a hotel room; he entered that room on his own volition after being instructed to do so by his employer, not by police officials; and the point of the questioning was to obtain information concerning the discrepancies between defendant's previous statements and those of other witnesses. The police officers testified that defendant was not the main suspect, that they could not tell who was lying and who was telling the truth, that defendant was at all times free to leave, that he was never threatened or given promises, and that he was offered food and drink several times. Any pressure or intimidation felt by defendant as a result of his employer's conduct cannot be charged to the police. The fourth amendment protects citizens against police misconduct, not misconduct of private citizens. Contrary to the majority view, I believe there was no intrusion by the State upon defendant's liberty when his employer told him to report to a hotel room for questioning.

In the course of the questioning in the hotel room, the police asked defendant if he would be willing to take a polygraph examination to help clear up the discrepancies in the stories of the various employees. He was advised that the test was not mandatory but completely voluntary. Defendant admitted at the suppression hearing that he *voluntarily* agreed to go to the private office of the polygraph ex-

aminer to take the test. He was offered a ride by one of the officers. Again, defendant was not required to go with the officer, but he agreed to ride with him. The polygraph examination took place in a private office, not in a police station or other public building. An interval of about 1½ hours (from 7:30 p.m. to 9 p.m.) separated the conclusion of the questioning of defendant at the hotel room and his arrival at the examiner's office. During that time defendant watched television in a hotel room. None of this activity constituted a custodial detention of defendant by police. In my view, the fact that he was in the presence of police officers in the hotel where he was employed did not amount to arrest or police detention.

According to the evidence at the hearing, at the precise point when defendant became a prime suspect, after he had made some admissions to the examiner without any officers being present, the attending officer was then notified and entered the examining room and told defendant that he was under arrest, and advised him of his *Miranda* rights. The attending officer was then given an oral statement by defendant after defendant indicated that he did not want an attorney. The officer requested a written statement, and defendant agreed. Such conduct on the part of the police was appropriate. (See *People v. Savory* (1982), 105 Ill. App. 3d 1023, 435 N.E.2d 226.) In *Savory*, the court noted that after 2½ hours of interrogation, the defendant was "in custody" for purposes of *Miranda* warnings when the officers began to doubt the defendant's account and started to ask express questions that they should have known were reasonably likely to elicit an incriminating response. Applying that test to the instant case, there is nothing to indicate that the police asked questions which were expected to elicit an incriminating response until after defendant was questioned by the examiner. That, of course, was the point where the *Miranda* warnings were given by the police, the point where the police interview ceased being investigatory and became a custodial interrogation. (See *People v. Bradford* (1981), 97 Ill. App. 3d 998, 423 N.E.2d 1179.) Considering the testimony which tended to support the trial court's finding that the defendant was not illegally detained for custodial interrogation, I would rule that the decision of the trial court was not manifestly erroneous.

Having found no illegal detention, I would hold that the defendant's confession was admissible at his trial. As I see it, the holding of the majority poses unnecessarily grave problems for those charged with solving crimes. Certainly not every investigatory inquiry, merely because made by a police officer, is attended by the mischief which the fourth, fifth, sixth and fourteenth amendments seek to avoid. Fi-

nally, the line must be drawn between voluntary, consensual confessions which are the product of "reasonable" police conduct and those confessions obtained by "unreasonable" police activity. That line is not a bright one. Each case must be carefully scrutinized in light of all surrounding circumstances (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041), and we should affirm the trial court's determination of voluntariness unless it is clearly unreasonable. *People v. Devine* (1981), 98 Ill. App. 3d 914, 424 N.E.2d 823.

With these thoughts in mind, I have searched the record before us and must conclude that no constitutional violation can be found. There is nothing in this case to indicate that the police treated defendant improperly. There was no light shining in his eyes, no deprivation of food or drink for long periods of time, no display of weapons, no threats or promises or bribes. The facts indicate nothing more than a questioning of defendant in the course of a police and fire investigation, asking for more details and additional information concerning matters he had previously told them and things they had discovered during the day. When the police could not determine who was telling the truth and who was not on the basis of the interview, they suggested a lie detector test.

By my view the majority opinion stretches the reader's credulity in finding that the defendant was illegally restrained while he watched TV in a hotel room, while he rode to the examiner's office, and while he took the polygraph examination—in the face of defendant's own testimony that he took the test voluntarily, knowing that he did not have to. The only reasonable implication from defendant's testimony is that he knew he did not have to go with the police for the polygraph test. Since the defendant's testimony amounted to an admission against his interest, it must be given considerable weight in support of the trial court's ruling.

In my judgment, the cases relied upon by the majority can all be distinguished from the case at bar and should not be considered controlling. Two important distinguishing elements of the case before us are (1) that the questioning occurred at the scene before defendant was a prime suspect and (2) that defendant himself stated that he voluntarily agreed to go to the polygraph tester's office. In every one of the cases cited by the majority, the defendant was taken by the police to the police station and questioned at the station before the police had probable cause to arrest him, and in all those cases, the courts concluded that a reasonable person, under the circumstances, would have considered himself under restraint, not free to leave, and therefore that an illegal detention occurred. In *People v. Townes* (1982), 91

Ill. 2d 32, 435 N.E.2d 103, the defendant "willingly" accompanied the police to the station, in another town, but was questioned there over a 12-hour period without the police having probable cause for an arrest. In *Townes*, it was the length of time involved that was perhaps most critical. I believe the circumstances of the instant case, unlike those relied upon by the majority, are not consistent with a finding that defendant was illegally seized or detained prior to his confession.

Defendant also contends that reversible error occurred when the prosecution introduced into evidence defendant's typewritten statement of April 16, 1981, where, in addition to admitting that he started the fires in question, defendant stated that he receives sexual gratification or excitement from fires and that he had set other fires to burn leaves or weeds. Defendant sought to have the comments relating the sexual aspects of fires excised from the statement on the ground that they were irrelevant and prejudicial, but the court refused to do so. We think the statements were relevant to the question of defendant's motive, even though defendant denied that sexual gratification was his motive here. The trial court must weigh the probative value of such evidence against its prejudicial effect. (*People v. Monroe* (1977), 66 Ill. 2d 317, 362 N.E.2d 295.) We cannot say that the court abused its discretion in this case.

For the reasons stated, I would affirm the circuit court of Peoria County in its denial of the motion to suppress defendant's confession.