THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MICHAEL TAYLOR, Defendant-Appellant.

First District (1st Division)   No. 82—909

Opinion filed July 18, 1983.

James J. Doherty, Public Defender, of Chicago (Marilyn Martin, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and LuAnn Rodi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial, defendant was convicted of murder, robbery and burglary. (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1, 18—1, 19—1.) Defendant was sentenced to concurrent respective terms of 22 years for murder and seven years for both the burglary and robbery. On appeal defendant contends that his written confession was improperly obtained in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Defendant also contends that if his confession is held inadmissible, then the other evidence would not be sufficient to sustain his conviction.

The facts concerning the issues are not in dispute. On June 25, 1980, the 86-year-old male victim was residing at a residential hotel on the north side of Chicago. The hotel manager last recalled seeing the victim at approximately 2 p.m. that day. On the morning of June 26, 1980, the manager was informed by another hotel clerk that the victim had still not been seen. Shortly after 9 a.m., the manager went to the victim's apartment located on the fourth floor of the building

and opened the room door. There he found the victim lying dead on the floor. The victim had a sock stuffed into his mouth and a belt tied over his mouth. The victim also had his hands tied behind him and his feet were bound. He had died of asphyxiation. The police were summoned. Their examination of the physical surroundings revealed the right palm print of the defendant on a service door leading into the victim's room. The police also discovered that a large sum of money kept by the victim was missing.[1]

The defendant, a Korean immigrant, was living with his uncle in Norridge, Illinois, in July 1980. The police investigation was directed toward the defendant possibly based on their previous arrest of his alleged accomplice, and it is to be gathered from the record that the police went to the Norridge residence on July 12, 1980, looking for the defendant but he was not there. The following day, defendant and members of his family went to the headquarters of the Chicago police department to determine the reason for the police inquiry. They were directed to Area 6, Violent Crimes Headquarters located on the northwest side of the city of Chicago. At approximately 6:30 a.m., defendant and members of his family arrived at Area 6 headquarters, and they were directed to the homicide unit located on the second floor of the building.

Officer Thomas Sappanos was the only officer in the homicide unit at that time, and he was assigned to sit at a desk to handle inquiries made to his unit. He had just returned from a 10-day furlough and had read several reports on pending homicide investigations taking place in the area. Defendant and his family approached Officer Sappanos, and defendant asked if this was the homicide office and if the officer was a homicide detective. After Sappanos affirmatively replied, defendant explained that he was there to confess to a murder.

Sappanos testified on the motion to suppress defendant's confession that he was "taken [a]back" by defendant's statement and did not know which crime defendant referred to. The officer then asked defendant what murder he was speaking of and to give him the location. Defendant told the officer on what street the murder occurred and indicated that he and his companion broke into the man's apartment and tied him up. Sappanos then remembered seeing a case report on the crime, and he put defendant into an interview room and advised him of his *Miranda* rights. Prior thereto, the officer said the

---

[1]In defendant's written confession defendant stated that he and an accomplice entered the victim's residence through the service door, overpowered the victim, and bound and gagged him before taking the money.

defendant was not in custody at the time he said he wanted to confess to a murder because the officer had no knowledge of the incident to which defendant was referring and merely asked more facts about it.

It is undisputed that after defendant was placed in the interview room, an assistant State's Attorney interviewed the defendant, and after again advising him of his *Miranda* rights defendant's signed confession detailing his complicity in the crime was obtained.

Defendant now contends that his initial statement to Officer Sappanos that he was there to confess to a murder was properly admitted because it was a voluntary statement which he made to the officer. However, defendant maintains that the second phase consisted of certain answers which he gave to Officer Sappanos concerning the details identifying the offense. Defendant maintains that this second phase amounted to custodial interrogation requiring *Miranda* warnings which in fact he did not receive until after Officer Sappanos had placed him in an interview room. Consequently, defendant maintains that his subsequent confession was impermissibly tainted by the questioning of Officer Sappanos and should have been suppressed.

In support of defendant's position he has cited *People v. Clark* (1980), 84 Ill. App. 3d 637, 405 N.E.2d 1192. There the police arrived at the scene of the occurrence and saw the victim slumped over the steering wheel of the car. The defendant, who was his wife, was nearby, and she appeared to be emotionally upset. The police placed defendant in their police car and then asked her what happened. She responded that she had shot her husband. This court concluded that questioning defendant thereafter without advising her of her *Miranda* rights precluded introduction of her subsequent statement to the police. We concluded that at this point the investigating officer was aware that defendant had shot her husband and that the investigation obviously focused on her conduct involving the shooting. Thus, the police inquiry was designed to elicit details of the occurrence which could prove incriminating. Further, in rejecting the State's claim that the subsequent questioning was merely routine and investigatory in nature, we concluded that the questions posed to defendant after she admitted that she had shot her husband went beyond the mere general on-the-scene inquiry. And we noted that the defendant had been deprived of her freedom when she was placed in the squad car. Defendant also cites other Illinois cases (*People v. Bryant* (1967), 87 Ill. App. 2d 238, 231 N.E.2d 4, and *People v. Mrozek* (1977), 52 Ill. App. 3d 500, 367 N.E.2d 783), in which the defendants in those respective cases were clearly in custody at the time their incriminating statements were elicited from them by police.

In the present case it is apparent that defendant was not in custody until he was taken to the interview room by Officer Sappanos. (Compare *People v. Bradford* (1981), 97 Ill. App. 3d 998, 1001-02, 423 N.E.2d 1179.) To that extent *Bryant, Mrozek* and *Clark* differ. And as hereinafter explained *Clark* is additionally distinguishable.

We reject defendant's contention that his answers to Officer Sappanos' questions during the second phase of the questioning at the desk of the homicide unit were not spontaneous or volunteered. We do not believe that such characterization necessarily is dispositive of the issue which defendant presents. Rather, we find apposite to this case the statement of our supreme court in *People v. Thompson* (1971), 48 Ill. 2d 41, 44, 268 N.E.2d 369, where the court stated:

> "The *Miranda* ruling was primarily directed at incommunicado interrogation at the stationhouse, in which the accused is subjected to the inherent compulsion of a police-dominated atmosphere. Specifically excepted were the traditional investigatory functions of the police, including general on-the-scene questioning in the fact-finding process, where 'the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.' [Citation.] Thus, statements made in response to routine investigatory questions, asked during a brief initial period of noncoercive detention and designed to clarify a suspicious circumstance, have often been held admissible under *Miranda*."

We believe that the situation confronting Officer Sappanos fits within the description contained in *Thompson*. Instructive to our conclusion are decisions from other jurisdictions involving situations quite similar to the one presented in this case. In *State v. Philbrick* (Me. 1981), 436 A.2d 844, the Supreme Court of Maine considered a situation where the defendant was taken to a police station by a motorist. The defendant was covered with blood, and he grasped a knife in his left hand while holding his injured right hand. When the uniformed police officer at the station asked the defendant what had happened, defendant indicated that he had been in a fight during which he shot the attacker. The officer then continued to question the defendant concerning the events surrounding the occurrence. The interview lasted for several minutes and defendant was not placed under arrest. The court concluded that the questions by the police officer were merely routine and qualified as a general on-the-scene questioning because the officer did not know anything about the circumstances about which the defendant was speaking and did not even know that a crime had been committed. The court stated, "A noncustodial inter-

rogation setting is not converted into a custodial interrogation situation merely because the questioning took place in a coercive environment such as in a police station or by a police officer." (436 A.2d 844, 849.) The court went on to say that the questions posed to the defendant by the officer were merely designed to clarify an ambiguous situation and were not a critical police interrogation which *Miranda* contemplated. The court concluded, "Questions asked in the wake of an event or occurrence which would naturally invite such an inquiry and which are characterized, as in the instant case, by brevity, neutrality and absence of an intent to elicit a confession or admission do not rise to the level of interrogation in the *Miranda* sense." 436 A.2d 844, 849; see also the discussion in *State v. Simoneau* (Me. 1979), 402 A.2d 870.

Similar results were reached in *Newhouse v. State* (Tex. Crim. App. 1967), 420 S.W.2d 729, where the defendant walked into a police station after stabbing his girlfriend at a cafe. He encountered a police officer and voluntarily told him that he had "cut up his girlfriend real bad." The officer then asked how badly she was hurt, and the defendant replied. The officer then went on to inquire whether his girl friend was dead, where defendant obtained the weapon and the reason why defendant came to him. The officer explained that he did not know anything about the crime until his conversation with the defendant and it was not until after he confirmed that a stabbing had in fact occurred with other officers that he arrested the defendant and advised him of his right to remain silent. The Texas court refused to suppress defendant's statement, finding that the statement was not made in contravention of *Miranda*.

In *Lung v. State* (Okla. Crim. App. 1966), 420 P.2d 158, defendant entered a police station and told the duty officer that he had stolen a car. He also indicated that the car was parked near the police station and voluntarily took the police outside and showed them where the car was located. The officers then called another police agency to verify the validity of defendant's statement. When the defendant's claim was verified, he was arrested. In holding that defendant's statements were proper, the court quoted language from *Miranda* wherein it was said, "There is no requirement the police stop a person who enters a police station and states that he wishes to confess to a crime * * *. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. 436, 478, 16 L. Ed. 2d 694, 729, 86 S. Ct. 1602, 1630.

In his reply brief, defendant has cited the Wisconsin Supreme Court decision of *LaTender v. State* (1977), 77 Wis. 2d 383, 253

N.W.2d 221. There the defendant walked into the police station and said that he had just killed a certain named priest. While one of the officers went to investigate at the rectory, the other officer continued to question the defendant and defendant revealed what he had done with the weapon. The Wisconsin court concluded that the question concerning the disposition of the weapon should not have been made without advising defendant of his *Miranda* rights.[2] However, we do not find *LaTender* persuasive authority given the unclear situation confronting Officer Sappanos in contrast to the fact that defendant in *LaTender* had identified his victim and it was only for the police to confirm the crime.

When Officer Sappanos was told by defendant that he wanted to confess to a murder, the officer was the only policeman stationed in the homicide unit. He had just returned from a furlough and was initially unaware of what crime defendant was speaking. In fact, the record shows there were several homicide investigations taking place by that unit. We believe that Officer Sappanos' questions concerning what crime the defendant was speaking of were proper without *Miranda* warnings because they were inquiries evoked by defendant's surprise statement that he wanted to confess to a murder. The officer properly elicited the street on which the crime occurred, and some facts indicating which homicide defendant was speaking about. Thus defendant's subsequent written confession was not inadmissible based on a claim that it was tainted by his prior statement.

Having rejected defendant's initial contention, we need not consider whether the evidence was sufficient to prove his guilt beyond a reasonable doubt because defendant claims that his contention would have merit if the confession is suppressed.

We grant the State's request for $50 in appellate costs under the authority of *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGLOON and GOLDBERG, JJ., concur.

---

[2]Defendant has also cited the case of *United States v. Jordan* (5th Cir. 1977), 557 F.2d 1081. However, we note that the fifth circuit has somewhat questioned the rationale of that case. See *United States v. Bennett* (5th Cir. 1980), 626 F.2d 1309, 1311 n.6.