THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
STEVEN MILLER, Defendant-Appellant.

First District (4th Division)    No. 79-935

Opinion filed December 18, 1980.

James J. Doherty, Public Defender, of Chicago (Timothy K. McMorrow and Marc Fogelberg, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Adrienne Noble Nacev, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

During the course of an attempted armed robbery Patricia Thomas was shot and killed. Defendant Steven Miller was subsequently charged with murder and attempt armed robbery. Following a trial by jury he was found guilty of both offenses and sentenced to concurrent prison terms of 40 to 120 years for murder and 6 to 18 years for attempt armed robbery.

On appeal defendant raises the following contentions: (1) evidence of his confession and identification in a lineup should have been suppressed as the products of an illegal arrest; (2) that evidence should also have been suppressed because it was obtained in violation of his fifth amendment rights; (3) the trial court erred in allowing evidence of defendant's initial arrest which suggested he had committed a separate offense; (4) defendant was prejudiced by improper comments made by the State in final argument to the jury.

We affirm.

Defendant filed pretrial motions to quash his arrest and suppress evidence, to suppress statements, and to suppress certain identification testimony. We summarize the evidence adduced at the hearing on those motions to the extent it relates to the contentions on appeal. Police Sergeant John Kennedy testified that on October 23, 1977, at about 9 p.m. from his squad car he observed a man, subsequently identified as the defendant, walking in a sunken walkway adjacent to a DePaul University women's dormitory. It was possible to look into the ground floor rooms from that walkway. Kennedy knew that there had been a number of incidents of "peeping toms" at this building. He also knew that two weeks earlier a male intruder had been discovered in one of the dormitory rooms. As Kennedy watched the defendant suddenly appeared to duck down. Kennedy approached in his car and again spotted the defendant; this time defendant was up against a dormitory window with his hands at the window. The defendant was wearing dark clothes and gloves although Kennedy testified the weather was not suited for gloves. As Kennedy emerged from his car defendant turned and saw him; he appeared startled and nervous. Defendant turned and began walking in the opposite direction from which he had just come. Kennedy called him over and observed a large bulge in his pants, appearing to Kennedy to be an erection. When asked what he was doing defendant stated he was going to an address which was in the opposite direction from the way in which he had been walking. Kennedy asked about this discrepancy but the defendant could not explain it. He was then advised of his constitutional rights, placed in a squad car Kennedy had summoned, and driven to the 18th District police station.

Kennedy remained behind and entered the dormitory, where he found no evidence of a forced entry to the window at which he had seen

the defendant. No one was in that room. He also located the girl who had previously seen an intruder and determined that she would be unable to identify that person.

Kennedy returned to the 18th District station where he obtained from defendant his name, address, and age. He called the Area 6 Homicide headquarters to see if defendant's description and the activities he observed matched any pattern of behavior in this area. He also attempted to verify defendant's identity through juvenile records but those could only be obtained in person through a youth officer and there were none at the 18th District. This check could also be made at the Area 6 location.

Sergeant Kennedy testified that defendant was not charged with a crime; he planned to release him once he had verified the information. When he spoke to the defendant he was very cooperative. He said he knew that the area was a bad one. When Kennedy told him he wanted to take him to Area 6 in connection with his investigation of crimes in the area defendant said he was more than willing to go along, that he knew there were a lot of things happening there. Defendant's only concern was getting a ride back home. Kennedy assured him he would be given one, and two other officers then took defendant to Area 6.

At Area 6 two officers, Paul Roppel and John Philbin, spoke to the defendant. Roppel testified that defendant was advised of his rights and said he understood them. However, Philbin testified that defendant was not advised of his rights at that time. Defendant was asked if he had knowledge of any robberies or shootings in the area of the Fullerton "el". To Roppel's astonishment defendant said he did have knowledge of the shooting of a girl who had been with two other girls in that area. Roppel and Philbin got the file on the case of Patricia Thomas and returned to question defendant, accompanied by Investigators Thomas O'Connor and Richard Hansen. Defendant told them he had been told by his brother, Glen, that Glen and two of Glen's friends were involved in the robbery and shooting. According to Officer Roppel defendant agreed to cooperate in the investigation. He was not under arrest and was free to leave. Defendant told the officers that his brother and the others were "probably up on the north side doing stick-ups." He stated they would probably not be home until morning. When asked he agreed to help the police locate them. He was told that under the circumstances his mother would not be informed of his location. Defendant stated that he understood, indicating he was aware of the possibility Glen could be alerted.

Defendant was left alone to sleep until about 4 a.m. He was then questioned further and he described the neighborhood where he said his brother and the others could be found. At about 5 a.m. Officer Roppel and Philbin took him to the Area 1 police station, which was located in the neighborhood defendant had described. From there the police drove to

the vicinity of defendant's apartment building. Defendant directed them to several places where he said the individuals' car might be located. No one was found during this search, which lasted two to three hours. At about 7:30 or 8 a.m. they decided to go to defendant's residence, where they found Glen and took him to Area 1. Defendant's mother was present at the apartment but was not told that defendant was with the police.

At the station, according to Officer O'Connor, defendant was still considered a witness and was totally cooperative with the police. O'Connor and Roppel confronted Glen with the accusation defendant had made. Glen told them the defendant was the one who "goes up to the north side and rips off." They then told defendant of this statement and he said, "They didn't do it, I shot her."

Defendant was immediately advised of his rights and arrested. Between 10:30 and 11 a.m., after having been transported back to Area 6, defendant was again advised of his rights and then made a full confession to Youth Officer Frank Giunta and O'Connor. Assistant State's Attorney Edward Nemetz interviewed him at about 4 p.m. that day. Nemetz testified that he advised defendant of his rights and then obtained an oral statement from him. He asked defendant about the period of time he had been with the police. Defendant told him he had been pretending to be a witness, that he had stayed with the police because he wanted to and that he was not told he could not leave. After defendant spoke to his mother and aunt he declined to make a written statement.

It was stipulated at the hearing that defendant had a substantial juvenile record.

After hearing argument on the motions the trial court held that probable cause had existed for the initial arrest, that subsequently defendant voluntarily went to Area 6 and was not in custody when his first incriminatory statement was elicited so that no *Miranda* warnings (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) were required to be given prior to this statement. The court also noted that because of this decision it did not have to determine whether defendant was given his rights at midnight, an issue on which Officers Roppel and Philbin offered contradictory testimony. All defendant's motions were denied.

At trial the State presented the testimony of three eye-witnesses to the shooting: they were Judy Davitz and Carolyn Damlich, two friends of the victim, and Billy Burrell, an alleged accomplice of the defendant.

According to Davitz, on July 1, 1977, at about 10 p.m. she, Damlich, and Patricia Thomas went to a local tavern at Belden and Lincoln in Chicago. They left at about 11:30 p.m. and walked back to Davitz' apartment building at 2302 North Sheffield. They paused outside the building where Davitz showed her friends a car she had just purchased.

The street was lighted by street lights and two lamp lights on the entrance of her building. Two men, one subsequently identified in court by her as the defendant, walked by. Defendant stared at them and muttered something as he passed. The three women entered the building's lighted foyer. Davitz' keys were in Damlich's purse, and Davitz and Thomas waited near the inner security door as Damlich, standing near the front door, searched her purse for the keys. At this point defendant and the other man barged into the foyer. Defendant pointed a gun at Davitz as he walked toward her and Thomas. Thomas began screaming and defendant said something like "Be cool, this is a robbery." When Thomas continued screaming defendant shot her twice and then fled with his companion.

The evening of the shooting Davitz viewed several books of photographs but did not see any pictures of the defendant. She did pick out several individuals with facial characteristics similar to those of the defendant. She did not recall having stated that one photograph bore a resemblance to the defendant but that she wanted to see him in person. Two weeks after the shooting Davitz viewed a lineup. Again she did not select anyone but did state that one man had facial characteristics similar to those of the defendant. She denied having said that one man looked similar to the shooter. On October 24, 1977, she viewed a lineup twice and both times identified defendant and his companion, Billy Burrell.

Carolyn Damlich also testified concerning the shooting in the foyer. She recalled that two young black men with guns entered and announced a stickup. One man, whom she identified as Billy Burrell, stood in front of her, partially blocking her view of the other man. She thus did not get a good view of the other man's face but she did see that he had his gun pointed at Davitz and Thomas. Damlich heard two gun shots; then Burrell took her purse and the two men ran out. She saw Thomas slumped in the corner. The night of the incident she looked at police photographs and picked out a man she said looked similar to the shooter, although she told police she needed to see the man in person to determine if she could positively identify him. Two weeks later she viewed a lineup in which she saw one man who looked similar to the shooter. On October 24, 1977, she viewed another lineup and identified Burrell and one other man, not the defendant, who both resembled the accomplice of the shooter. She viewed the lineup a second time and positively identified Burrell as the shooter's companion. Damlich testified at trial that she was unable to identify the man who shot Thomas.

Burrell testified that on July 1, 1977, at defendant's suggestion he and defendant decided to commit a robbery. They passed by the three women on Sheffield, and defendant suggested they go back. They went inside where defendant announced a stickup. One of the girls screamed, defendant shot her, and they both ran. Burrell identified Thomas from a

photograph as the woman who was shot. He admitted that following a trial in which he denied any involvement in the shooting he was convicted for the murder of Thomas.

Officer John Kennedy testified to the circumstances of the arrest of the defendant, including substantially the same testimony concerning defendant's activities immediately prior to the arrest as he gave at the hearing on the motion to suppress. He also testified upon cross-examination by the defendant that no charges were placed against the defendant as the result of what he had observed prior to the arrest.

Officer Paul Roppel testified to the lineup identifications by Davitz and Damlich on October 24, 1977. He also related defendant's initial statement concerning the shooting in which he exculpated himself and inculpated his brother and the two others.

Investigator Thomas O'Connor related the confession which defendant made to him at 11 a.m. on October 24. Defendant told him that on the day of the shooting his cousin gave him a gun and told him to commit some robberies, the proceeds to be divided between them. Defendant met Burrell at Fullerton and Sheffield, and Burrell agreed to join him. They followed the three women into the building on Sheffield and announced a stickup. One girl screamed and reached for his gun. Defendant became frightened and shot her. He grabbed the purse and ran. He and Burrell split the money found in the purse, placed the gun inside, and threw the purse into the Chicago River.

Assistant State's Attorney Edward Nemetz testified that later on the same day of defendant's statement to O'Connor defendant told him that he had shot Patricia Thomas. It was stipulated that defendant was 16 at the time of the offense and 17 at the time of trial.

Defendant presented three police witnesses in an attempt to discredit Judy Davitz' identification of him. Officer John Steiner, a police artist, testified that he drew a sketch of one of the offenders based on a description by Carol Damlich. Davitz viewed it and told him it was not accurate although she did point out some similar facial characteristics. Officer Theodore O'Connor testified that the day after the shooting he showed some photographs to Davitz and Damlich. Both women stated that a photograph of a man named Rogers bore a resemblance to the shooter but that they would have to see him in person to be sure. Officer Joseph Stachula testified that he conducted a lineup two weeks after the shooting. Davitz and Damlich viewed it and said none of the men was involved in the shooting but that one of the men looked similar to "the offender."

I.

Defendant first contends that his initial arrest was made without probable cause and therefore the lineup identification and confession

obtained following that arrest should have been suppressed as products of an illegal arrest.

We find that the trial court properly held that there was probable cause for the arrest. Probable cause exists where the facts and circumstances known to the arresting officer would justify to a man of reasonable caution the belief that a crime has been or is being committed by the individual he intends to arrest. (*Carroll v. United States* (1925), 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280; *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.) In determining the existence of probable cause, the courts are concerned with probabilities derived from the factual and practical considerations of everyday life by reasonable and prudent men. (*Brinegar v. United States* (1949), 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302; *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) To that end, the courts properly recognize that we are often evaluating actions by police officers which are necessarily based on a quick evaluation of the circumstances confronting them. *People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356; *People v. Watkins* (1960), 19 Ill. 2d 11, 166 N.E.2d 433, *cert. denied* (1960), 364 U.S. 833, 5 L. Ed. 2d 59, 81 S. Ct. 57.

■■ In this instance the arresting officer, by his own testimony, knew the following: The defendant was first seen in a walkway next to a women's dormitory at 9 p.m. There had been a number of incidents of "peeping toms" at this building. Two weeks earlier a male intruder was discovered in one of the dormitory rooms. Upon closer investigation on this evening the officer found the defendant with his hands up against one of the windows of the dormitory. He was wearing dark clothing and gloves on a night when, according to the officer, gloves were not required by the weather. When the officer approached the defendant appeared startled and nervous and began to walk in the opposite direction from which he had come. The officer called the defendant over and observed that he appeared to have an erection. Defendant's explanation of where he was going was unsatisfactory. Given these facts and circumstances we find no basis for overturning the trial court's determination that probable cause existed for defendant's arrest at that time. Although the officer was never asked what crime the defendant was arrested for, the circumstances suggest an obvious answer. Section 26—1(a)(5) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 26—1(a)(5)) provides:

"A person commits disorderly conduct when he knowingly:
* * *

(5) Enters upon the property of another and for a lewd or unlawful purpose deliberately looks into a dwelling on the property through any window or other opening in it;
* * * ."

The facts we have summarized strongly suggest that defendant was

engaging in this activity. It was only after the arrest that the officer determined that no one was in the room in question. Accordingly the admission of defendant's confession ·and the lineup identification testimony was not subject to suppression on this ground.

## II.

■■ However, defendant also attacks the admission of this evidence on an independent ground. He contends that the failure of the police to give him the *Miranda* warnings immediately before confronting him with his brother's statement was a violation of his fifth amendment rights and required suppression of the resulting evidence. These warnings are required prior to custodial interrogation, a term defined by the *Miranda* court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way." (384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) The State contends that defendant was neither in custody nor subject to interrogation at the time the incriminating admission was made. Because we agree that defendant was not in custody within the meaning of *Miranda* we do not reach the question of whether the actions of the police amounted to interrogation.

The testimony of the police, which the trial court clearly believed, established that after defendant's initial arrest and transportation to the station it was determined that no charges would be placed against him. But at the station defendant became extremely cooperative. He stated that he was more than willing to accompany the police to Area 6 in connection with their investigations of crimes in the area. His only concern was receiving a ride home, which he was promised. He volunteered to the police that he had knowledge of a shooting in the area and he agreed to assist them in locating the people he said were responsible. Subsequently defendant did actively assist the police in locating his brother. Thus, up until the moment when defendant was confronted with his brother's statement the evidence establishes that he was viewed by the police as a voluntary, cooperative witness.

The fact that police suspicions may have shifted to the defendant when his brother implicated him in a general fashion, or that his statement was elicited at a police station, does not render the situation a custodial one. As was stated in *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714:

> "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to

everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." (Emphasis in original.) (See *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.)

Again we find no basis for overturning the trial court's determination that defendant was not in custody when he made his first incriminating statement. Therefore, no *Miranda* warnings were required prior to that statement.

### III.

■■ Before trial, defendant made a motion *in limine* to bar any testimony concerning the circumstances of his initial arrest by the police. This motion was denied, and that evidence was adduced at trial. He now contends this was prejudicial error. As a general rule evidence of other crimes may be admissible if relevant for any purpose other than showing mere propensity to commit a crime. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Cole* (1963), 29 Ill. 2d 501, 194 N.E.2d 269.) In this cause the evidence was relevant to establish the circumstances of defendant's arrest and his subsequent confession. In determining that the evidence should be admitted the trial court noted that the defendant would have the opportunity to establish that defendant was never charged with an offense arising from his actions prior to the arrest. Indeed, defense counsel did elicit this information from the police at trial. Under these circumstances we find that the evidence was properly admitted.

### IV.

■■ Defendant notes, however, that the State in final argument to the jury chose to comment on this evidence in the following manner:

"What was [defendant] doing at night prowling around the north-side neighborhood. The northside, and you know, you heard that he is from 77 East 38th Street. And he is up on the northside prowling around at night. What is he doing looking through the window of a girl's dormitory. Why is he hanging around up there. And he knows you know he is back in the same neighborhood that he murdered Patty Thomas just a couple of months ago, a couple of blocks away. He is intruding on the lives of young women, again. The most important proof that you have of the defendant's guilt is the defendant, himself."

This was clearly improper comment on the evidence. The fact that the evidence was adduced for another proper purpose did not give the State license to utilize it for the improper purpose of suggesting it showed a pattern of criminal behavior by the defendant. Had the evidence in this case been close, this comment might have been cause for reversal. But because of the overwhelming nature of the evidence of defendant's guilt, we find the error to be harmless. The defendant confessed to the crime, an eyewitness positively identified him, and his accomplice also detailed defendant's involvement. Given the nature of this evidence we do not find that the improper comment of the State was a factor in defendant's conviction. *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.

Defendant has also complained of several other instances of alleged improper comment by the State. In one instance the State noted that defendant's accomplice had been found guilty of murder. The State then began the statement: "Billy Burrell was found legally accountable * * *." Defense counsel's objection cut off the sentence. Counsel sought a mistrial on the ground that the State was suggesting that Burrell's guilt was derivative of defendant's. The court denied the motion but offered to admonish the jury if defendant so wished. Counsel declined the offer, stating he did not wish to heighten the impact of the statement. We find no prejudice arising from this. The testimony of Burrell was that he had been found guilty of the murder of Patricia Thomas. He also testified that he had assisted the defendant in an armed robbery and that it was defendant who fired the fatal shots. Defendant's confession and the testimony of Judy Davitz also established that defendant was the shooter and Burrell had accompanied him. Furthermore the statement of accountability was cut off before the State could specifically assert that Burrell was found guilty in that manner. Under these circumstances, we find no prejudicial error in the statement.

The remaining comments to which defendant objects on appeal were not objected to at trial and thus are deemed to be waived. *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.

Defendant's conviction is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.