THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. CONNOR K. GORMAN *et al.*, Defendants-Appellees.

Fourth District   No. 4—90—0177

Opinion filed January 17, 1991.

462

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Arthur M. Lerner, of Lerner & Kirchner, of Champaign, for appellee Connor K. Gorman.

George F. Taseff and Harold M. Jennings, both of Bloomington, for appellee Glenn R. Schicker.

J. Steven Beckett, of Beckett & Crewell, of Champaign, for appellee Aleck A. Zavalis.

JUSTICE STEIGMANN delivered the opinion of the court:

Defendants Connor Gorman, Glenn Schicker, and Aleck Zavalis were charged with two counts of arson (Ill. Rev. Stat. 1989, ch. 38, par. 20—1) arising from the September 24, 1989, fire at Memorial Stadium on the campus of the University of Illinois (University). The three defendants were individually questioned by University police department investigators, but none of them was given the *Miranda* warnings prior to being interviewed. The trial court granted defendants' motions to suppress the statements they made in response to this questioning. The State appeals the suppression order.

We affirm.

## I. FACTS

On September 24, 1989, a fire at Memorial Stadium significantly damaged the Astroturf playing field. An accelerant had been used to ignite the Astroturf surface, resulting in a fire which caused over $600,000 in damage.

On October 6, 1989, University police received a tip suggesting that Zavalis and two other unnamed persons were responsible for the fire. Acting on this tip, University police investigators Michael J. Costa and Steven Trame went to Zavalis' apartment on October 9, 1989, to interview him concerning the fire. Zavalis was out of town on that date, so Costa and Trame returned to the apartment at approximately 8 a.m. the next morning. They knocked on the door, and it was answered by Schicker. Because Schicker matched the description of one of the unnamed persons, Costa immediately viewed Schicker as a suspect. Costa and Trame identified themselves as University police officers and asked the whereabouts of Zavalis. Schicker told them that Zavalis had left the apartment and inquired as to the subject matter of their visit. The investigators declined to tell Schicker the nature of their business. Shortly thereafter, Zavalis returned to the apartment. The investigators were again asked the nature of their business, and they again declined to answer. They told Schicker and Zavalis that they wished to talk with all the residents of the apartment. Schicker then left the living room, went upstairs, and woke two other roommates, Kevin Abel and Gorman. A fifth roommate, Brian Pianfetti, whose bedroom was adjacent to the living room, also entered the apartment living room. When Gorman entered the living room, Costa also viewed him as a suspect because he matched the description of the other unnamed individual.

When all five roommates were assembled in the living room, the investigators stated they were interested in interviewing them at the University police station in Urbana. Pianfetti asked the investigators the nature of their business, and again Costa and Trame declined to tell them, stating that they preferred instead to inform the students at the police station. Schicker told the investigators that he had an exam that morning, so he arranged to meet them at 10:30 a.m. instead. Abel notified the investigators that he had a term paper to finish, so he arranged to meet them at the police station at 2 p.m. that afternoon.

The investigators asked the remaining three students whether they were available for an interview that morning. The testimony at the hearing on the motion to suppress was in conflict regarding Costa's response. Zavalis testified that he told the investigators he had to

go to class and that Costa told him class could wait. Costa testified that he could not remember telling Zavalis that he should miss his class.

Zavalis, Gorman, and Pianfetti then went with Costa and Trame to the University police station. The students were transported to the station in an unmarked police car. The police car contained a police radio, but did not have a cage between the front and backseats or backdoors that locked automatically. The students were not handcuffed and rode together in the backseat of the car. Costa and Trame gave different explanations for why the students were encouraged to ride with them to the station. Costa testified that he offered the students a ride because of the limited availability of parking on campus. Trame testified that Costa offered the students a ride because "it was cold out that morning and it was quite far away" from the apartment to the police station. Zavalis and Gorman testified that they did not believe they had any choice but to go to the station with the officers.

At the station, the students were separated; Pianfetti and Gorman were placed in one room while Zavalis was placed in Lieutenant Kristal Fitzpatrick's office. Fitzpatrick's office measured approximately six feet by eight feet and contained a desk and chairs. At one point, while waiting for the interviews to begin, Zavalis briefly left the office, but was told by a University police officer to return to the office and sit down.

Zavalis was interviewed by Costa. Costa entered Fitzpatrick's office, closed the door, and sat in a chair next to Zavalis. He told Zavalis that he could leave at any time, but Zavalis testified that his impression was that he was not free to leave. Fairly early in the interview, Zavalis told Costa that he might be interested in obtaining a lawyer. Zavalis testified that Costa asked him, "Are you sure you want to talk to a lawyer?" Costa reported that he advised Zavalis that, "If he wanted to contact a lawyer at this time he was free to do so." Zavalis decided to continue the interview. Subsequently, Zavalis made the statements to Costa that were the subject of his motion to suppress. Following the interview, the police drove Zavalis back to his apartment.

Trame interviewed Gorman in a room measuring six feet by nine feet. The room's sliding door was closed, but did not shut all the way. Trame sat across from Gorman during the interview. He told Gorman that he was not under arrest and that he was free to go after the interview was over, but not until it was over. Gorman at first denied involvement in the stadium fire, at which point Trame left the room. Trame returned five minutes later and told Gorman that fingerprints

on matches, a football stadium goal post, and a charcoal lighter fluid container linked him and Zavalis to the fire. Trame also suggested a hypothetical scenario of two or three college students getting drunk and mischievously setting fire to the Astroturf by mistake. Gorman requested to leave the room and to talk to his roommates, but Trame told Gorman that his roommates were being interviewed and that he would not be allowed to talk to them at that time. Trame again encouraged Gorman to confess, adding that it was probably the fault of the company that manufactured the turf that the stadium carpet burned. Trame again suggested a scenario of college pranksters whose fun got out of control. At that point, Gorman made the statements that were the subject of his motion to suppress.

After Gorman made his inculpatory statements, Trame left the interview room and informed his supervisor, Fitzpatrick, of what Gorman had said. Soon thereafter, Fitzpatrick or some other officer contacted the Champaign County State's Attorney's office to initiate the filing of charges. A written statement was prepared by Trame and signed by Gorman. Gorman elected to walk home after being offered a ride back to his apartment.

Following his scheduled class, Schicker dropped his books off at his apartment and proceeded to walk to the police station. On his way, he met with Gorman, who was returning from his interview. Gorman informed Schicker that he and Zavalis had confessed. Schicker arrived at the police station at approximately 10:30 a.m. and was directed to Fitzpatrick's office by Trame. Schicker testified that he did not believe he could leave the station if he wanted to because "there were police all around" and that he "had to be there." Schicker's interview took place in Fitzpatrick's office with the door closed, Costa sitting behind the desk, and Trame standing behind Schicker.

At the hearing on the motion to suppress, conflicting testimony regarding Schicker's interview was presented. Costa testified that Schicker immediately said, "I know what it's about, I want to confess." Schicker denies making this admission and claims that he made a statement only after being assured that he would not be arrested "no matter what." There is dispute as to what stage of the interview Costa provided Schicker with this information. Costa testified that he told Schicker it was a voluntary interview at the interview's outset. Schicker claims that these admonitions were given well after the interview had started. Costa admitted that he told Schicker that Schicker was not under arrest and would not be put under arrest at any time after the interview. Schicker testified that he did not believe he was free to leave.

Schicker made inculpatory statements during this interview. Costa wrote out a statement that Schicker reviewed and edited. Following the interview, Costa informed Schicker that warrants were to be issued the next day. Schicker testified that he thought Costa was going to provide him with a copy of the statement he had just made and that Costa had promised not to arrest him at any time.

On October 11, 1989, Gorman, Schicker, and Zavalis were arrested and charged with two counts of arson.

All three defendants moved to suppress the statements given during the October 10 interviews. The trial court heard evidence and arguments on the motions and concluded that the October 10 interviews were custodial interrogations which required the officers to inform defendants of their rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. The court ruled that the defendants were clearly the focus of a criminal investigation, that they were separated and placed in a custodial environment, and that a coercive atmosphere existed at the University police station. The court concluded that in the absence of the *Miranda* warnings, defendants' motions to suppress should be granted, and stated the following:

> "We then have, at one time or another, the Defendants either going in the car or arriving later at the police department, depending on which Defendant you're talking about, and the matter progresses. It's a fact that a number of times, probably with respect to each Defendant, each was told that this was voluntary on their part and that they were not under arrest. Apart from that, however, we have to look at certain other things, certain other things that were said and other nonverbal conduct. We have covered the best of what was said about when they would be free to leave.
>
> I conclude from everything before me, including the exhibits here, that it was likely, they were not told, or certainly not told in a way that they would ever understand, that they could leave at any time. But the logical conclusion even from Costa's own words, is that they were told, insofar as being able to leave, that that would be only after the interviews took place.
>
> There was the business about 'they would not be arrested at any time' that's been, tried to be characterized as meaning that they would not be arrested right after the interview. But when you look at everything here, including the words of the officers, and I have been struck by the transcript, the language in the transcript from the previous hearing [held on January 5, 1990], it begins to mean more and more when you look at it, that any

reasonable person would understand it to mean that you will not be arrested at any time, period. I could go into certain other subtle things. The business of the fingerprints, the conversation that came up about the lawyer with respect to Mr. Zavalis, et cetera. Not controverted, that what was stated was something to the effect of 'Are you sure you really want to have a lawyer?' Subtle things here. This thing began to become coercive, and it continued to become coercive throughout. When I put it all together, I don't like the atmosphere that all of this took place under.

\* \* \*

I have to conclude they're in custody under the criteria that the law applies to these kinds of cases.''

## II. ANALYSIS

The State argues on appeal that the University police were not required to give the *Miranda* warnings because the defendants' interviews were not custodial interrogations. The State claims that the defendants were at the police station voluntarily, were told that they were not under arrest, and were told that they could leave at any time.

■■ The issue before this court is whether to uphold the trial court's suppression order. A reviewing court may not disturb a suppression order unless the trial court's decision is manifestly erroneous. *People v. Brown* (1990), 136 Ill. 2d 116, 125, 554 N.E.2d 216, 220; *People v. Neal* (1985), 109 Ill. 2d 216, 218, 486 N.E.2d 898, 899.

■■ ■ Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way. (*Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612; *Brown*, 136 Ill. 2d at 124, 554 N.E.2d at 219.) The determinative test is whether there is a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. (*California v. Beheler* (1983), 463 U.S. 1121, 1125, 77 L. Ed. 2d 1275, 1279, 103 S. Ct. 3517, 3520; *Brown*, 136 Ill. 2d at 124, 554 N.E.2d at 219.) As the court noted in *Brown*, another way of stating this test is to ask whether a reasonable man, innocent of any crime, would believe himself to be in custody if he were in defendant's position. (*Brown*, 136 Ill. 2d at 125, 554 N.E.2d at 220.) Several factors discussed in *Brown* should be considered in determining whether an interrogation is custodial: the location, length, mood, and mode of the interrogation; the number of police officers present; any indicia of formal arrest or evidence of

restraint; the intentions of the officers; and the extent of knowledge of the officers and the focus of their investigation. (*Brown*, 136 Ill. 2d at 124-25, 554 N.E.2d at 220.) The trial court should examine and weigh these factors, along with the credibility of the witnesses, as it decides the motion to suppress evidence. *Brown*, 136 Ill. 2d at 125, 554 N.E.2d at 220.

■ We begin our analysis by addressing a threshold issue that is implicit in defendants' motions to suppress their statements: Was there evidence before the trial court of a subjective belief on the part of the defendants that they were in custody during their interrogations? This threshold issue is not often acknowledged because defendants bringing motions to suppress typically testify, as did defendants in the present case, that they believed themselves to be in custody. However, the case could arise where no such testimony is offered. This issue may be clarified by asking the following: In deciding a motion to suppress, would the trial court have to examine the objective indicia of custody discussed in *Brown* had the defendant at the hearing on the motion testified that at all times he believed that he was *not* in custody and that he was free to leave the company of the police interrogators whenever he wished? See, *e.g., People v. Urban* (1990), 196 Ill. App. 3d 310, 314, 553 N.E.2d 740, 742 (finding the State's contention that defendant was free to leave at any time unrebutted by defendant).

Each of the three defendants in the present case testified that he believed he was in custody at the time he made the statements that are the subject of his motion to suppress. Accordingly, the requirement of evidence on this threshold issue has been met, and we proceed with the rest of our analysis, beginning with a discussion of interrogations conducted in police stations.

### A. *Police Station Cases*

■ Merely because a suspect is questioned at the police station does not mean that he is in custody for purposes of *Miranda*. In *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711, the United States Supreme Court held that questioning by the police does not *per se* constitute custodial interrogation. The Court stated as follows:

> "Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a

crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes places in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' " *Mathiason*, 429 U.S. at 495, 50 L. Ed. 2d at 719, 97 S. Ct. at 714.

If a person goes to the police station on his own initiative, there is doubt as to whether he is in custody. (See 1 W. LaFave & J. Israel, Criminal Procedure §6.6(d), at 494 (1984).) Similarly, under the reasonable innocent-person test, a suspect who is driven to the police station by police officers is not necessarily in custody. (*People v. Finklea* (1983), 119 Ill. App. 3d 448, 453, 456 N.E.2d 680, 683.) However, even if a suspect goes to the police station voluntarily or at the invitation of the police, the circumstances may eventually become custodial in nature. *People v. Wipfler* (1977), 68 Ill. 2d 158, 168-70, 368 N.E.2d 870, 874-75; *Finklea*, 119 Ill. App. 3d at 453, 456 N.E.2d at 683; *People v. Bradford* (1981), 97 Ill. App. 3d 998, 1001, 423 N.E.2d 1179, 1183 (finding proper use of *Miranda* "when the interview ceased being investigatory and became custodial interrogation"); *People v. Mrozek* (1977), 52 Ill. App. 3d 500, 507, 367 N.E.2d 783, 787 (finding defendant who voluntarily appeared at police station to be in custody).

Whenever the police choose to conduct "non-custodial interrogations" at the police station, there is a substantial risk that a court subsequently will disagree that the circumstances were noncustodial. (See generally Annot., 31 A.L.R.3d 565 (1970 & Supp. 1990); see, *e.g.*, *Weathers v. State* (1989), 105 Nev. 199, 772 P.2d 1294; *State v. Hoeplinger* (1988), 206 Conn. 278, 537 A.2d 1010; *Jones v. People* (Colo. 1986), 711 P.2d 1270; *State v. Menne* (La. 1980), 380 So. 2d 14; *Commonwealth v. Haas* (1977), 373 Mass. 545, 369 N.E.2d 692; *White v. State* (Miss. 1974), 290 So. 2d 616; *People v. Lucy* (1990), 204 Ill. App. 3d 1019; *State v. Little* (Iowa Ct. App. 1988), 421 N.W.2d 172; *People v. Celaya* (1987), 191 Cal. App. 3d 665, 236 Cal. Rptr. 489; *State v. Micheliche* (1987), 220 N.J. Super. 532, 533 A.2d 41; *People v. Brainard* (1986), 122 A.D.2d 299, 503 N.Y.S.2d 915; *Johnson v. State* (Ind. Ct. App. 1985), 484 N.E.2d 49; *Commonwealth v. Craig* (1985), 345 Pa. Super. 542, 498 A.2d 957; *State v. Wininger* (Fla. Dist. Ct.

App. 1983), 427 So. 2d 1114; *State v. Pollock* (1974), 22 N.C. App. 214, 206 S.E.2d 382; *State v. Vining* (1970), 2 Wash. App. 802, 472 P.2d 564.) This risk arises because police stations are typically the location of custodial interrogations, thereby giving credibility to a suspect's claim that he believed himself to be in custody despite police testimony about how they treated the suspect. The interrogating officers ought to know that if the suspect makes incriminating statements and is later arrested, a motion to suppress those statements assuredly will be filed, and the defendant, as in the present case, is almost certain to testify that he believed he was in custody at the time he made those statements. The issue of defendant's custody then becomes a question of fact to be resolved by the trial court in accordance with the criteria discussed earlier. By choosing the police station as the location for their allegedly "non-custodial interrogations," police officers give defendants, who later claim they believed they were in custody, the greatest possible advantage to support that claim. As in this case, the setting of the interrogation will be subject to very close scrutiny to see what support it lends to defendant's claim of custody. The placement of furniture, the size of the room, the presence of armed officers, whether doors were opened or closed (and if closed, whether they were locked), the transport of the suspect into the depths of a building where ingress and egress is typically controlled by security measures, all might give support to a defendant's claim that he did not believe himself free to leave.

Perhaps the best means of demonstrating the risk of finding coercion whenever a suspect is interrogated at a police station is to ask whether the same arguments made by the suspect ("I was taken to a small room, the door was closed, I was told to wait, other armed officers were present, *et cetera*") would sound nearly as credible or persuasive if the interrogation had occurred instead at the local Burger King restaurant, a nearby park, the suspect's own residence, or in any location of the *suspect's* choosing. We think not, and the case law in point supports that conclusion.

■ We emphasize that the trial court's decision on the issue of custody is the resolution of a question of fact, and that decision will not be disturbed unless it is *manifestly erroneous*. The burden of convincing a court of review that a trial court's decision regarding custody is manifestly erroneous is a heavy one indeed, and, as in this case, the State often will simply be unable to carry it.

We acknowledge that there are many cases, like *Mathiason*, in which questioning at a police station has been found not to constitute custodial interrogation. Nonetheless, for the reasons we have dis-

cussed, the police run a significant (and often unnecessary) risk whenever they choose to conduct a "non-custodial" interrogation at a police station. The risk is that a trial court will disagree with them and find the interrogation to be custodial.

## B. *Intent, Knowledge, and Focus of the Police*

Just because the police ask someone to answer questions does not mean that they have created a coercive atmosphere. (See *Mathiason*, 429 U.S. at 495, 50 L. Ed. 2d at 719, 97 S. Ct. at 714.) "An assumption that one is required to cooperate with the police can hardly be equated with an arrest; every citizen has a duty to assist police officers up to the point of self-incrimination." (*Bradford*, 97 Ill. App. 3d at 1002, 423 N.E.2d at 1183, citing *Wipfler*, 68 Ill. 2d at 167, 368 N.E.2d at 873.) Even though an individual is a suspect in the minds of the police, this focus by itself is not enough to create custodial interrogation. (See *Beckwith v. United States* (1976), 425 U.S. 341, 346-48, 48 L. Ed. 2d 1, 7-8, 96 S. Ct. 1612, 1616-17; *People v. Kenning* (1982), 110 Ill. App. 3d 679, 684, 442 N.E.2d 1337, 1340.) "The fact that police suspicions may have shifted to the defendant *** or that his statement was elicited at a police station, does not render the situation a custodial one." *People v. Miller* (1980), 91 Ill. App. 3d 1031, 1038, 415 N.E.2d 538, 544; see also *Finklea*, 119 Ill. App. 3d at 453, 456 N.E.2d at 683.

Because in its ruling suppressing defendants' statements the trial court noted that defendants were the focus of a criminal investigation, we deem it appropriate to clarify how the issue of "focus" should be viewed by the trial courts when deciding whether a suspect was in custody when he was interrogated by police officers. This court recently dealt with this issue in *People v. Bury* (1990), 199 Ill. App. 3d 207, 556 N.E.2d 899, in which the defendant allowed police officers, armed with an arrest warrant, to search his residence, discussed his involvement in the charged offense, and signed a preprinted form entitled "Voluntary Statement." The trial court's decision to suppress defendant's statements was not based upon any finding that defendant was in custody, but instead on the police officers " 'playing games with the constitution' " by not arresting the defendant or giving him the *Miranda* warnings even though they possessed a warrant for his arrest. (*Bury*, 199 Ill. App. 3d at 209, 556 N.E.2d at 901.) This court reversed, concluding that the defendant made his statements and allowed the search of his home free from any coercive pressures of the police. (*Bury*, 199 Ill. App. 3d at 212, 556 N.E.2d at 903.) "The focus of the inquiry must always be on what

the defendant thought and believed, not the [police] officers." (*Bury*, 199 Ill. App. 3d at 213, 556 N.E.2d at 903.) The intent of police officers is relevant only to the extent that it may assist the trier of fact in determining whether the police, through their verbal and nonverbal conduct, created a coercive atmosphere requiring the *Miranda* warnings. (*Bury*, 199 Ill. App. 3d at 213, 556 N.E.2d at 903.) This court discussed this point further, as follows:

> "In weighing all of these circumstances, the subjective intent of the police officers is relevant only to the extent that it might color their outward behavior. These intentions become probative when there is a conflict in the evidence between the defendant and the officers over how the officers behaved. If the officers intended all along to arrest the defendant, then the court might reasonably resolve such a conflict by doubting the ability of the officers to hide their intentions. But, the fact that the officers might have intended to arrest the defendant when their interrogation ceased is of no significance if their behavior was such that this intent was never revealed to the defendant. In other words, that the investigation had focused upon the defendant, even to the extent, as here, that the officers possessed an arrest warrant as the interrogation was taking place, does not matter as long as the defendant was not aware of the officers' intentions." *Bury*, 199 Ill. App. 3d at 213, 556 N.E.2d at 903.

While we acknowledge that the focus of the officers' investigation upon a suspect is one of the factors which, according to *Brown*, should be considered by the trial court when deciding whether a suspect was in custody during an interrogation (*Brown*, 136 Ill. 2d at 124-25, 554 N.E.2d at 220), we believe the foregoing analysis puts the issue of focus into its proper (and limited) context. Further, the *Bury* analysis is consistent with the decisions of the United States Supreme Court regarding focus. In *Beckwith*, the Court rejected the argument that the *Miranda* warnings had to be given and stated the following:

> "[W]e agree *** that
>
>> '[t]he major thrust of Beckwith's argument is that the principle of *Miranda* and *Mathis* should be extended to cover interrogation in non-custodial circumstances after a police investigation has focused on the suspect.' [Citation.]
>
> *** [W]e 'are not impressed with this argument in the abstract nor as applied to the particular facts of Beckwith's interrogation.' [Citation.] It goes far beyond the reasons for that holding and such an extension of the *Miranda* requirements

would cut this Court's holding in that case completely loose from its own explicitly stated rationale." (*Beckwith*, 425 U.S. at 345, 48 L. Ed. 2d at 6-7, 96 S. Ct. at 1615.)

The Court in *Beckwith* quoted approvingly the following from *United States v. Caiello* (2d Cir. 1969), 420 F.2d 471, 473:

" 'It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning.' " *Beckwith*, 425 U.S. at 346-47, 48 L. Ed. 2d at 7-8, 96 S. Ct. at 1616.

In *Beheler*, the Court reviewed a decision by a California appellate court which held that the *Miranda* warnings should have been given to the defendant because "the interview took place in the station house, that before the station house interview the police had already identified Beheler as a suspect in the case because Beheler had discussed the [case] with police earlier, and that the interview was designed to produce incriminating responses." (*Beheler*, 463 U.S. at 1123, 77 L. Ed. 2d at 1278, 103 S. Ct. at 3519.) The Court reversed, noting that, "It is beyond doubt that Beheler was neither taken into custody nor significantly deprived of his freedom of action." (*Beheler*, 463 U.S. at 1123, 77 L. Ed. 2d at 1278, 103 S. Ct. at 3519.) In so holding, the Court specifically rejected, as meaningful for *Miranda* purposes, the appellate court's analysis that the police "had a great deal" of information about Beheler's role in the crime they were investigating before they interviewed him. *Beheler*, 463 U.S. at 1125, 77 L. Ed. 2d at 1279, 103 S. Ct. at 3520.

The Illinois Supreme Court in *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870, has similarly indicated that "police focus" upon defendant has limited relevance when a court resolves the issue of custodial interrogation. In *Wipfler*, the trial court conducted a hearing on defendant's motion to suppress his statements and found that when defendant first went to the police station and spoke with the police, he was in custody. The court further found defendant's interrogation became custodial at the point he was given the *Miranda* warnings, after the police said they did not believe him and in response he said he "would tell the truth about everything." (*Wipfler*, 68 Ill. 2d at 164, 368 N.E.2d at 872.) The supreme court affirmed the trial court and made the following significant observation:

"Having decided that a reasonable, innocent man would not have understood himself to be under arrest in this case, it is not necessary to our holding on this issue [of whether defend-

ant was in custody during the early portion of his interrogation] that we determine the intent of the officers." *Wipfler*, 68 Ill. 2d at 167, 368 N.E.2d at 873.

We view these remarks as directing the trial court's attention, when deciding questions of custody, to the perspective of the suspect, not to the subjective intentions of the police. "Coercion is determined from the perspective of the suspect." (*Illinois v. Perkins* (1990), 496 U.S. 292, 296, 110 L. Ed. 2d 243, 251, 110 S. Ct. 2394, 2397.) On this matter of a suspect's perceptions, the Supreme Court has written the following:

> " '[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." (Emphasis added.) *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689-90.

See also *Perkins*, 496 U.S. at 296-97, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397.

In *Bradford* (97 Ill. App. 3d at 1001, 423 N.E.2d at 1183), the court held that an interrogation at a police station which originally was noncustodial in nature became custodial during its course, requiring the giving of the *Miranda* warnings. *Wipfler* and *Bradford* are applicable to the present case, where these defendants may have initially appeared at the police station voluntarily, but subsequent events gave credence to their claim that they believed they were in custody.

### C. Indicia of Arrest Cases

■ Although the police may tell a suspect that he is free to leave and that he is not under arrest, a suspect may still reasonably perceive that he is in custody. Any control over the person by the police suggests custody. See *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612; *People v. Holveck* (1990), 141 Ill. 2d 84, 95; *In re N.E.R.* (1987), 159 Ill. App. 3d 320, 324-26, 512 N.E.2d 132, 135; *Mrozek*, 52 Ill. App. 3d at 507, 367 N.E.2d at 787 (finding custody, in part, because defendant was not permitted to leave the police station

or go unaccompanied to the water fountain).

Conversely, some courts have declined to find a defendant in custody when the police do not perform those procedures which the public associates with arrest, such as searching, booking, and fingerprinting. *Wipfler*, 68 Ill. 2d at 167, 368 N.E.2d at 873; *People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.

■ Here, the trial court found that each defendant was restrained in some manner, and the record provides some support for those findings (specifically, Gorman being told he could not talk to his friends or leave until the interview was over, Zavalis being ordered back to Fitzpatrick's office by a police officer, and Schicker being interviewed as Trame blocked the door). We note that police station interviews such as these were the primary focus of concern of the United States Supreme Court when it decided *Miranda*. Professor Yale Kamisar has explained these concerns as follows:

"It is the impact on the suspect's mind of the *interplay* between police interrogation and police custody—each condition *reinforcing* the pressures and anxieties produced by the other—that, as the *Miranda* Court correctly discerned, makes 'custodial police interrogation' so devastating. It is the suspect's realization that the *same persons* who have cut him off from the outside world, and have him in their power and control, want him to confess, and are determined to get him to do so, that makes the 'interrogation' more menacing than it would be without the custody and the 'custody' more intimidating than it would be without the interrogation.

It is this *combination* of 'custody' and 'interrogation' that creates—and, in the absence of 'adequate protective devices,' enables the police to exploit an *'interrogation* environment' designed to 'subjugate the individual to the will of his examiner.' It is this *combination*—more awesome, because of the interplay, than the mere sum of the 'custody' and 'interrogation' components—that produces the 'interrogation atmosphere,' *'interrogation . . .* in a *police dominated* atmosphere,' that 'carries its own badge of intimidation,' that 'exacts a heavy toll in individual liberty and trades on the weakness of individuals,' and that is so 'at odds' with the privilege against compelled self-incrimination." (Emphasis in original.) (Kamisar, *Brewer v. Williams, Massiah, & Miranda: What is "Interrogation"? When Does It Matter?*, 67 Geo. L.J. 1, 63-64 (1978) quoting phraseology of *Miranda*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.)

On the record before us, we cannot conclude that the trial court's determination that these defendants were in custody at the time of their statements—essentially, in the words of Professor Kamisar, that they were in an " '*interrogation* environment' designed to 'subjugate [them] to the will of [the questioner]' "—is manifestly erroneous.

For the reasons stated, the trial court's order suppressing the statement of each defendant is affirmed.

Affirmed.

GREEN and KNECHT, JJ., concur.